**In the Matter of the Contested Case of LAURA BAKER SCHOOL ASSOCIATION, Respondent,**

v.

**DEPARTMENT OF HUMAN SERVICES, Petitioner, Appellant.**

**No. C8–85–833.**

Supreme Court of Minnesota.

Sept. 19, 1986.

Hubert H. Humphrey, III, Atty. Gen., Deborah L. Huskins, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Curtis D. Forslund, Lynne E. Stanley, Minneapolis, for respondent.

Allan Baumgarten, Office of the Legislative Auditor, St. Paul, for amicus curiae.

COYNE, Justice.

We have granted the petition of the Minnesota department of human services for review of the court of appeals' decision that Laura Baker School Association may apply to the department of health for certification as an intermediate care facility for the mentally retarded without first securing a determination of need from the department of human services, 377 N.W.2d 465. We reverse the decision of the court of appeals and reinstate the decision of the commissioner of human services that a determination of need is prerequisite to certification as an intermediate care facility for the mentally retarded (ICF/MR) and that its refusal or failure to determine that there was need for certification of Laura Baker School as such a facility was not unreasonable.

Laura Baker School has operated as a residence for the mentally retarded in Northfield since 1897. For as long as Minnesota has licensed such facilities, Laura Baker School has been licensed by the department of health as a supervised living facility and its program for the mentally retarded has been licensed by the department of human services. The School has not, however, been certified as an intermediate care facility for the mentally retarded (ICF/MR) eligible to receive Title XIX Medical Assistance or Medicaid. 42 U.S.C. § 1396 (1982). Operating costs, to the extent neither residents nor their families could pay them, were paid by Rice County. In fact, until the completion in 1983 of a five-year, $1.2 million project for the renovation of its physical plant, funded by charitable donations and accomplished without the prior approval of the department of human services, Laura Baker School was not eligible for certification as an ICF/MR.

In 1979, at the suggestion of the Rice County Welfare Board, the School decided to seek certification as an ICF/MR so that it would be eligible for Medical Assistance reimbursement. The school did not apply immediately to the commissioner of human services for a determination of need; instead, it waited to make application until

April 27, 1983, after the completion of the improvement project. The application proposed a change from a 73 bed supervised living facility to a 73 bed ICF/MR. Accompanying the application was a letter dated November 9, 1982, from the Rice County director of social services to the executive director of Laura Baker School expressing the welfare board's support for the building improvements and hope that necessary requirements for Title XIX were being met. The department of human services accepted the letter as evidence of the county board's approval of the building improvements but, pursuant to Minn.Rules 9525.-0080, subp. 6, requested the county board's comment on the application and proposed programmatic change to an ICF/MR. On May 19, 1983, the department of human services received Rice County's letter approving the School's program plan and supporting certification as an ICF/MR.

On June 10, 1983, a statutory prohibition on the issuance of a determination of need or a license for any new intermediate care facility for mentally retarded persons became effective. Act of June 9, 1983, ch. 312, art. 9, 1983 Minn.Laws 1778, 1868. On September 21, 1983, citing the statutory moratorium, the department formally notified Laura Baker School of the denial of its request for change of status to ICF/MR.

On appeal pursuant to the Administrative Procedure Act, the administrative law judge recommended that Laura Baker School be certified as an ICF/MR. The commissioner of human services denied certification. On review by certiorari the court of appeals held that the School was not required to obtain a determination of need, but could apply directly to the department of health for certification as an ICF/MR. The court of appeals also ruled that the department of health should treat the application as if it had been made on April 27, 1983, the date of the original application for a determination of need.

Over the last several years Minnesota has shifted its emphasis away from maintenance of the mentally retarded in state institutions in favor of the development of community based services. Much of the cost of community based services is borne by the county in which the facility is located. Thus, for example, those operating costs of Laura Baker School which neither the residents nor their families can pay are paid by Rice County. Services provided, however, by an intermediate care facility are covered by Medical Assistance. An intermediate care facility (ICF) is an institution which (1) provides health-related care and services to persons who do not require hospitalization but who are determined, in accordance with Title XIX of the Social Security Act, to require care and services (above the level of room and board) that can be made available to them only through institutional facilities and (2) which meet the standards of safety and sanitation and for the proper provision of care as prescribed by federal regulations. Minn.Rules § 9500.1070, subp. 3(B) (1983). An intermediate care facility for mentally retarded persons (ICF/MR) is an institution whose physical facility is licensed by the department of health under Minn.Stat. §§ 144.50–144.56 (1984), whose residential program is licensed by the department of human services under Minn.Stat. §§ 245.-781–245.812 and § 252.28 (1984), and whose overall program is certified by the department of health as meeting the federal standards set in 42 C.F.R. §§ 442.400–442.516. Minn.Rules § 9500.1070, subp. 3(B). The cost of Medical Assistance reimbursement of an ICF/MR is met by combined federal, state, and county funding, with the county contributing less than five percent of the total cost.

In June of 1982 concern over the suitability of the variety of services for mentally retarded persons and over the cost of providing those services prompted the Legislative Audit Commission to authorize a study of community programs for the mentally retarded. In his *Evaluation of Community Residential Programs for Mentally Retarded Persons* issued February 11, 1983, the legislative auditor documents problems in the planning and regulation of residential services provided mentally retarded persons. The *Evaluation* is sharply crit-

ical of the type of community residential program provided by ICFs/MR and similar facilities:

> [T]his report's most important conclusion is that Minnesota has continued to place too much emphasis on long-term residential care. To reduce the population of state hospitals, the state has encouraged development of community residential facilities that are too restrictive and expensive. At the same time, Minnesota has not adequately developed alternative services that could enable retarded persons to live more independently.

Program Evaluation Division, Office of the Legislative Auditor, State of Minnesota, *Evaluation of Community Residential Programs for Mentally Retarded Persons,* Preface, February 11, 1983.

The legislative auditor pointed out that the development of ICFs/MR continued at a rapid pace even though the projected needs for 1987 had already been exceeded in 1982. Furthermore, these new facilities do not meet the state's need, identified in the *Welsch v. Noot*[1] consent decree, to deinstitutionalize the mentally retarded and to provide services enabling them to live in the least restrictive environment consistent with their needs and conditions. Although the state is required under the *Welsch* consent decree to reduce the population of mentally retarded persons in state hospitals to no more than 1850 by July 1, 1987, only 22 percent of the residents of the facilities certified as ICF/MR came from state hospitals. Moreover, few of the ICF/MR residents are severely handicapped because of mobility or behavior problems. More than half of the residents of ICFs/MR opened in 1981 were only mildly or moderately retarded.

The legislative auditor made three recommendations:

(1) Increasing the availability and use of alternative forms of residential care;

(2) Encouraging existing facilities to serve more dependent individuals; and

(3) Limiting development of new ICFs/MR.

Following close on the heels of the legislative auditor's Evaluation was *A Proposed Plan of Action for the Redesign of the Scope and Funding of Services for the Mentally Retarded in Minnesota,* issued by the commissioner of human services on March 21, 1983. Prominent in the commissioner's plan were recommendations for limiting the number of ICF/MR beds and to make Medical Assistance available to fund semi-independent living services and other alternative forms of residential services.

A month later, on April 27, 1983, Laura Baker School submitted its application for a determination of need with respect to the School's proposed change from a 73 bed supervised living facility to a 73 bed ICF/MR. Application for a proposed facility is filed with the county, Minn.Rule § 9525.0080, subp. 2 (1983), but application for change in a licensed facility is, according to rule, submitted to the commissioner of human services:

> If a licensed facility requests an increase or decrease in licensed capacity, or change in program of any facility or service, that may require change in staffing or remodeling, the facility shall apply to the commissioner directly. No change shall be granted until the county board has an opportunity to comment. The commissioner shall notify the county board of such a request by sending a copy of the request to the county board. The county shall have 30 days to comment. The commissioner shall use the same criteria as is specified for original applications.

Minn.Rule § 9525.0080, subp. 6 (1983). Whether the application is for a proposed or existing facility, the commissioner of human services is charged with making the final determination of need, location and program. Minn.Stat. § 252.28, subd. 1 (1982). The criteria on which the determination is to be based are directed to the

---

**1.** *Welsch v. Noot,* No. 4–72 Civ. 451 (D.Minn., Sept. 15, 1980). The policy of deinstitutionaliza-

tion embodied in the *Welsch* consent decree is set forth also in Minn.Rules § 9525.0050 (1983).

protection of the human and civil rights of mentally retarded persons, to the location and size of the facility, and its funding. Minn.Rule § 9525.0080, subp. 4 (1983). Specifically, the criteria are intended to assure the availability of a "small, homelike facility near [the resident's] family," and to assure that the size of the facility relates to the need of the clients for services and meets standards for the provision of services. Included in the applicable criteria is this provision:

> No facility for more than eight persons shall be approved unless it can be clearly shown that the needs of the residents will be better served in a larger facility and only if the size of the living units (including bedrooms, living rooms, dining room, and kitchen) are for no more than six persons....

*Id.* Finally, the commissioner is required to consider the facility and program plan cost projections to assure that they are within fiscal limitations and meet standards of effective program management.

After the commissioner had declined to determine a need for certification of Laura Baker School as an ICF/MR, the School for the first time contended that it was not required to seek a determination of need because in its application it requested no change in its licensed capacity or program which would require a change in staffing or remodeling. Its remodeling had been completed prior to its application for a determination of need. The commissioner, on the other hand, asserts that an application for change from a supervised living facility to an ICF/MR is a request for a change in program, "that may require change in staffing or remodeling" in order to meet the standards set out in federal regulations.

Inasmuch as it is conceded that Laura Baker School did not meet federal stan-

dards for an ICF/MR until after it had been remodeled, its assertion that the rule may be circumvented by a fait accompli is singularly unpersuasive. Construction does not create the need. Moreover, the argument begs the question. The rule requires a determination of need if a licensed facility requests a "change in program of any facility or service, that may require change in staffing or remodeling." The question, then, is whether the renovation project and proposed change in the funding of the School's operating costs constitute a change in program invoking the requirement for a determination of need. We think so.

■ "Program" is defined at Minn.Rules § 9525.0210, subp. 17 (1983), as "the general term used in these rules to refer to all people, events, and environments that lead to a purposeful outcome (goal or objective) for the individual resident. These programs include, but are not limited to, training and maintenance of the individual; the design, furnishing, and use of space; staff and staffing patterns; and professional and volunteer services."

The inclusion of design, furnishing, and use of space in the definition indicates that the remodeling itself triggers the need determination requirement. Since, however, the department of human services approved the buildings on May 17, 1983, some three weeks before the effective date of the moratorium, it can be argued—if the remodeling is the only change in program—that approval was equivalent to a determination of need.

It seems to us, however, that the definition of "program" is broad enough to include the funding of the residential program [2] that is known as Laura Baker School when eligibility for the proposed change in funding is dependent on a $1.2

---

**2.** "Residential program" means a general term used in this rule to refer to the program of services to residents of a supervised living facility ... which has an administrative organization and/or structure for the purpose of providing care, food, lodging, training, supervision, habilitation, and treatment as needed for more than

four mentally retarded individuals on a 24–hour per day basis. Residential programs may also be known as, but are not limited to group homes, child-caring institutions, boarding-care homes, nursing homes, state hospitals, public institutions, and regional centers.
Minn.Rule § 9525.0210, subp. 21 (1983).

million remodeling project. Among the criteria for a need determination is the requirement that the commissioner be assured that the facility and program cost projections are within fiscal limitations and meet standards of effective program management. Even if the School does not contemplate any change in service, extensive remodeling of its physical plant is likely to have some impact on its operating costs. Moreover, the change which Laura Baker School proposes is intended to shift those operating costs formerly paid by Rice County to the Title XIX Medical Assistance program. Medical Assistance costs are apportioned about 52 percent to the federal government, 43 percent to the state, and less than five percent to the county. The relevant fiscal limitations to be considered in determining need, then, are limitations of the Medical Assistance program. The legislature has charged the department of human services with the fiscal management of services to mentally retarded persons and the management of the state's Medical Assistance budget and has also authorized the department to determine the need, location, and program of public and private facilities for mentally retarded persons. It is, therefore, only reasonable to interpret the statutory grant of authority, Minn.Stat. § 252.28 (1984), and the rules regarding the determination of need, Minn. Rules § 9525.0080 (1983), as authorizing the determination of need for a change in funding in the event eligibility for the proposed funding out of the Medical Assistance budget, for which the department is responsible, requires that the facility be remodeled.

■ Laura Baker School contends, however, that even if a determination of need was required, the department was obliged to grant the School's request prior to the effective date of the moratorium imposed by Act of June 9, 1983, ch. 312, art. 9, 1983 Minn.Laws 1778, 1868.

Laura Baker School filed its application for a determination of need with the department of human services on April 27, 1983, just 44 days before the effective date of the statutory moratorium. On April 29 the departmental review committee considered the application. Since the committee considered Rice County's letter of November 9, 1982, which pre-dated the application by almost six months, as comment on the buildings only, a copy of the application was sent to Rice County on May 12 for comment on the total program of the School, the need for its service, and the effect of these on its possible certification. That same day the committee approved the new buildings, into which the School had moved a week or so before filing its application, but declined to recommend approval of the requested change to ICF/MR status. On May 18, 1983, after Rice County had received notification of departmental approval of the buildings, the county sent its comment based on review of the program plan and program cost projections, which the county thought met standards of effective program management and were within fiscal limitations. Predictably, the county, which pointed out that it was financially responsible for 22 current residents of Laura Baker School, considered the need for the services provided by the School to be self-evident and supported ICF/MR certification.

Rice County's recommendation was received by the department on May 19, 1983. Four days later, on May 23, the legislature passed a bill which called to a halt the certification of intermediate care facilities for the mentally retarded and limited the number of beds in such facilities to 7,500 as of July 1, 1983.[3] The next regularly scheduled meeting of the departmental review committee was held on May 26, 1983. The committee declined to act on the School's application because, the administrative law judge found, it considered it imprudent to act within 30 days of the receipt of the county's comment in the face of the legisla-

---

3. At the time the statute was enacted there were 7,489 beds in certified ICFs/MR. The statute provides that the total of certified intermediate care beds should in no event exceed 7,000 on July 1, 1986. Laura Baker School has 73 beds.

tion which was then awaiting the governor's signature and because of the department's conclusion that no more than 7,500 certified ICF/MR beds were needed in the state.

On June 9, 1983, the governor signed the bill, and the bill became effective on June 10, 1983. On September 21, 1983, the department formally advised Rice County and Laura Baker School that the program of service described in its application was approved but its request for change of status to ICF/MR was denied in accordance with the provisions of Minn.Laws 1983, ch. 312, art. 9.

It is our view that the department acted upon the School's application with reasonable promptness—if at a somewhat deliberate pace. Minn.Rules § 9525.0080, subp. 5 (1983) provides that the county and the applicant will be notified within 30 days of receipt of applicant information and recommendation of the county board of the commissioner's decision. There is no similar time limitation for decision on applications for change—only a provision that "no change shall be granted until the county board has an opportunity to comment." Minn.Rules § 9525.0080, subp. 6 (1983). Customarily, however, the commissioner acts within 30 days after receipt of the county's comments. Here, the moratorium became effective less than 30 days after receipt of the county's recommendation.

Laura Baker School contends, however, that the department should not have sought additional comment from the county, that the letter of November 9, 1982 was sufficient. Certainly, in light of Rice County's financial interest in the School's eligibility for Medical Assistance reimbursement, the county's recommendation that there was need for certification could be anticipated. Nevertheless, the county's comment about the buildings had long preceded the application and nothing in the application indicated that the program of the remodeled facility was unchanged with respect to services, staffing and the like. As a result, solicitation of comment about

the program was appropriate and, in fact, required by the rule.

Furthermore, even if the department had treated the November 9 letter as the county's approval of a request for certification, the legislature passed the moratorium bill on May 23, only 26 days after the filing of the application. Apart from our not infrequent observation that even statutory provisions prescribing the time in which public officers shall discharge their duties are generally deemed directory, *Benedictine Sisters Benevolent Ass'n v. Pettersen,* 299 N.W.2d 738, 740 (Minn.1980), in a finding adopted by the commissioner the administrative law judge found that the department did not unreasonably or illegally defer consideration or approval of the school's application for a determination of need. We cannot hold otherwise.

Finally, Laura Baker School urges this court to conclude that it is entitled, as a matter of law, to a need determination for certification under the exception found in Minn.Stat. § 252.291(2)(b) (1984), which authorizes the commissioner in coordination with the department of health to approve a new ICF/MR only "when the facility is necessary to serve the needs of identifiable mentally retarded persons who are seriously behaviorally disordered or who are physically or sensorily impaired." While it concedes that most of its adult residents are semi-independent, able to work in sheltered workshops or to attend developmental achievement centers, and require limited supervision, it relies heavily on the administrative law judge's finding that the School has a waiting list of persons for ICF/MR beds. That finding does not justify the conclusion that the School is entitled to certification under the pertinent statutory exception, and the commissioner's declination to approve the application is neither unsupported by substantial evidence nor arbitrary or capricious.

Our decision is limited to the record presented and is not intended to preclude the School from seeking certification pursuant to the exceptions enumerated in Minn. Stat. § 252.291 (1984). The application at

issue was prepared prior to enactment of section 252.291 and, as a result, did not anticipate or address the necessary factors.

Reversed.